UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 09-61227-CIV-SEITZ/O'SULLIVAN

DR. ROBERT PEREZ,
    Plaintiff,
v.

THE CANADA LIFE ASSURANCE CO.,
    Defendant.
_____/

### ORDER GRANTING MOTION TO STRIKE AND EXCLUDE EXPERT TESTIMONY

THIS MATTER is before the Court upon Defendant's Motion to Strike and Preclude the Testimony of Plaintiff's Expert [DE 27] Howard Ruskin, M.D., pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Defendant the Canada Life Assurance Company ("Canada Life") requests Dr. Ruskin's opinion, that stress from a roof leak was a precipitating factor in Plaintiff's stroke, be stricken and that Canada Life's summary judgment motion be considered in conjunction with this ruling. Upon review, the Court finds that Dr. Ruskin does not base his causation opinion on a reliable methodology, nor will testimony that stress from a roof collapse was associated with Plaintiff's stroke assist the trier of fact to understand the evidence or determine a fact in issue. Accordingly, Defendant's motion is granted.

I.    **BACKGROUND**

This action arises out of a claim for disability payments under a policy of disability insurance ("Policy"). On or about May 14, 1996, Plaintiff, Dr. Robert Perez, suffered a thalamic infarct, *i.e.*, a stroke ("stroke") while driving, which resulted in his disability. [DE 28 Exs. 3, 5]. Plaintiff began to collect disability payments from Canada Life, which were paid until his sixty-fifth birthday. The sole issue in this case is whether Plaintiff's disability was caused by "sickness or disease" or "accidental bodily injury" as those terms are defined in the Policy. If Plaintiff's stroke was the result of a "sickness," then Canada Life properly terminated his disability benefits when Plaintiff reached age sixty-five. On the other hand, if Plaintiff's disability resulted from an "accident," then Canada Life should not have terminated Plaintiff's benefits on his sixty-fifth birthday.

Plaintiff contends that his stroke was an "accidental stroke" under the Policy and seeks to admit expert testimony that a May 13, 1996 incident in which he claims he was struck in and about the head and upper body

by collapsing ceiling and roofing materials at his place of business "caused or contributed to a thalamic stroke suffered by [him] at that time, and which resulted in his disability." [DE 29 ¶¶ 2, 3; DE 36 at 2]. Plaintiff claims that the roof and ceiling collapse caused hemodynamic changes in his cerebral vascular system, resulting in the thalamic stroke. [DE 36 at 16]. Plaintiff submits that his expert's testimony can relate the "traumatic events of May 13, 1996 to the cerebral vascular injury." [DE 37 at 13].

Plaintiff's sole expert to testify in this matter is Dr. Howard Ruskin, a neurologist and Plaintiff's treating physician, whom he first consulted for his stroke on May 20, 1996, one week after the ceiling collapse. Dr. Ruskin is expected to testify, in conformity with his prior deposition testimony,[1] that the May 13, 1996 accident contributed to a thalamic stroke suffered by Plaintiff at that time. There is no dispute that prior to the stroke, Plaintiff suffered from a pre-existing vascular disease based on his long standing hypertension and triglyceride problem. There is also no dispute that Dr. Ruskin's knowledge, skill, experience, training, and education qualify him to testify as an expert in this matter – he is a neurologist with more than thirty years of clinical practice and is a college-level professor of neurology. It is the scope of Dr. Ruskin's testimony which Canada Life seeks to limit. Canada Life moves to preclude Dr. Ruskin from testifying that the ceiling and roof collapse caused Plaintiff's stroke based on the failure of Dr. Ruskin's conclusions to meet the reliability standards of *Daubert*. Plaintiff maintains that Dr. Ruskin's opinion is admissible because Canada Life's challenges go simply to the weight, and not the admissibility of the testimony. [DE 36 at 13].

## II.   LEGAL STANDARD

The Federal Rules of Evidence assign to the trial judge the gatekeeper task of ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 148-49 (1999); *Corwin v. Walt Disney World Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007). When determining if expert testimony is admissible under Federal Rule of Evidence 702, the Court must conduct a

---

[1] Dr. Ruskin testified in a state court negligence case arising out of the ceiling collapse that Plaintiff filed against his landlord and roofing contractor. *Perez, et al v. HUMCLA, Inc., et al*, Case No. 00-6301 (17th Judicial Circuit, in and for Broward County).

rigorous three-part inquiry considering whether: (1) the expert is qualified to testify competently regarding the matters intended to be addressed through "knowledge, skill, experience, training, or education"; (2) the methodology used to reach conclusions is sufficiently reliable, as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). The party offering the expert bears the burden to establish, by a preponderance of the evidence, the proper foundation for the admission of the expert's testimony – qualification, reliability, and helpfulness. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004), *cert. denied*, 544 U.S. 1063 (2005).

### III. DISCUSSION

Determining the reliability of the proposed expert opinion entails an assessment of whether the reasoning or methodology is valid and can be applied to the issues in the case. *Daubert*, 509 U.S. at 592-93. Factors used to guide federal courts in deciding whether the expert's testimony is reliable include (1) whether it can be (and has been) tested; (2) whether the theory or technique has been subject to peer review or publication; (3) the known or potential rate of error; and (4) the degree of acceptance within the relevant community. *Daubert*, 509 U.S. at 592-93. None of these factors mitigates in favor of admitting the testimony of Dr. Ruskin.

#### A. *Reliability*

Plaintiff argues that Dr. Ruskin bases his causation opinion on a differential diagnosis. [DE 36 at 14]. A medical opinion about causation, based upon a proper differential diagnosis, is sufficiently reliable to satisfy *Daubert*. *Glastetter v. Novartis Pharmaceuticals Corp.*, 252 F.3d 986 (8th Cir. 2001). However, an expert's credentials do not fill analytical gaps in forming an opinion and "nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *G.E. v. Joiner*, 522 U.S. 136, 145-146 (1997).

In performing a differential diagnosis, a physician begins by "ruling in" all scientifically plausible causes, then "rules out" the least plausible causes until the most likely cause remains. *Hendrix v. Evenflo*

-3-

*Company, Inc.*, 609 F.3d 1183, 1195 (11th Cir. 2010). In the first step, the Court must ensure that "the expert's opinion on general causation is 'derived from scientifically valid methodology.'" *Id.* To do this, the Court must assess the reliability of the expert's opinion on whether the factor can, in general, cause the harm Plaintiff alleges, as well as whether the factor could have caused Plaintiff's specific harm. *Id.* at 1196. Then, in the second step, the expert must eliminate all causes but one. *Id.* at 1197. Upon review of Dr. Ruskin's deposition, it is clear that he did not conduct a proper differential diagnosis to form his opinion about the cause of Plaintiff's stroke.

### 1. Dr. Ruskin Did Not Derive His Opinion From A Scientifically Valid Methodology.

Plaintiff argues that "Dr. Ruskin 'ruled in' the roof and ceiling collapse incident as the probably acute cause of the thalmic stroke suffered by the Plaintiff, based on his examination and testing of the Plaintiff, history provided by the Plaintiff, and onset of symptoms described by the Plaintiff." [DE 36 at 14]. Dr. Ruskin's testimony, however, reveals that he has no scientifically valid bases for his opinion that the roof collapse was a precipitating factor in Plaintiff's stroke:

| | |
|---|---|
| Question: | Just so we're clear, the sole basis for your opinion of the causal relationship between the roof collapse and [Plaintiff] Dr. Perez's stroke is the temporal relationship to the two; correct? |
| Answer: | Yes. |
| Question: | There's no other scientific or medical basis for you making that judgment; correct? |
| Answer: | Correct. |

[Dr. Ruskin Dep. at 37:24-38:6].

This inference of causation based upon a purely temporal sequence is not a scientifically valid methodology. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005). Assuming causation on temporal relationship alone rests upon adoption of the *post hoc, ergo propter hoc*[2] fallacy, which the Court will not do. A mere temporal relationship between the roof collapse event and Plaintiff's stroke does not provide

---

[2]The "*post hoc ergo propter hoc*" fallacy "'assumes causation from temporal sequence. It literally means 'after that, because of this' . . . . It is called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship.'" *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1343 (11th Cir. 2010) (quoting *McClain*, 401 F.3d at 1243).

scientifically valid method to permit an expert to place that event on a list of possible causes of the stroke. *Id.*

Plaintiff argues that "Dr. Ruskin's testimony does specifically address the physiologic mechanism by which the Plaintiff's stroke occurred, which raises Dr. Ruskin's opinion above a mere 'temporal' conclusion." [DE 36 at 15].

> [T]his man did indeed have pre-existing vascular disease based on his long standing hypertension and triglyceride problem. And based on the sequence of events which took place, it leads me to believe that this sequence of events was the result of severe stress and ultimately alterations in the hemodynamics situation of the blood supply to the thalmus, possibly producing some constriction of the blood vessel which was previously altered from his disease process resulting in stroke.
>
> \* \* \*
>
> I can give you an analogy which I think most people can accept fairly clearly if you like. You heard the story about somebody having an argument with his wife and then suddenly having a heart attack and dropping dead. Same mechanism. In other words, the blood vessels are capable of constricting under certain physiologic stressful events, and this supplies also to the brain. So, obviously, something occurred in the physiology of his circulation as a result of this extenuating circumstance which resulted in disruption of normal blood flow and a stroke.

[Dr. Ruskin Dep. at 22:18-23:2, 13-25 ].

Dr. Ruskin's knowledge of the mechanisms of a stroke does not alter the fact that his conclusion that stress from a roof leak was a precipitating cause of Plaintiff's stroke is based solely on the temporal association and not science or medicine. Furthermore, Dr. Ruskin's opinion is premised on the assumption that stress can cause a stroke, an assumption for which he has proffered no evidence to support (*e.g.*, peer reviewed studies). Further, even after speculating that stress played a part in Plaintiff's stroke, Dr. Ruskin could not distinguish between the various sources of stress involved to precipitate Plaintiff's stroke, including problems with his family regarding his daughter's marriage." [Dr. Ruskin Dep. at 48]. Thus, due to the other stressors, Dr. Ruskin was unable to conclude with reasonable certainty that stress from a ceiling collapse contributed to Plaintiff's stroke in the first place: "Now the fact there were other stresses in his life, surely they're contributing to the situation, and I cannot partition how much stress one event was causing versus the other event." [*Id.* at 15:10-13]. Consequently, Dr. Ruskin, although a neurologist qualified to testify as an expert, provides no scientifically valid

methodology regarding the role of stress in causing a stroke, let alone Plaintiff's stroke.[3] This type of *ipse dixit* opinion is precisely the type of opinion that fails the *Daubert* inquiry.

        2.    <u>Dr. Ruskin Did Not "Rule Out" The Least Plausible Causes Of Plaintiff's Stroke.</u>

Moreover, Dr. Ruskin did not eliminate all but one possible cause of Plaintiff's stroke, but rather concluded that a number of predisposing and psychological factors may have precipitated Plaintiff' stroke. In addition to "ruling in" stress from the roof and ceiling collapse, Dr. Ruskin also "ruled in" a number of other factors that could have caused Plaintiff's stroke: his pre-existing vascular disease based on his long standing hypertension and triglyceride problem, as well as other psychological stressors in his life. However, Dr. Ruskin did not rule out any of these factors, in part because he was unable to determine whether Plaintiff's stroke was caused by vascular disease only or vascular disease with psychological stress. [Dr. Ruskin Dep. at 26:12-13]. A testifying expert "cannot merely conclude that all risk factors for a disease are substantial contributing factors in its development." *Guin v. Astrazeneca Pharmaceuticals LP*, 602 F. 3d 1245, 1254-55 (11th Cir. 2010). Because Dr. Ruskin did not rule out any factors, his opinion on the "cause" of Plaintiff's stroke was not based upon a proper differential diagnosis. Therefore, Dr. Ruskin did not base his opinions on a reliable methodology.

    **B.**    ***Helpfulness to the Trier of Fact***

Even if the proponent of the expert witness meets his burden of establishing that the expert's testimony qualifies as scientific knowledge, the testimony must logically advance a material aspect of the proposing party's case. *See Daubert*, 509 U.S. at 592-93; FED. R. EVID. 702. Dr. Ruskin's testimony is offered to explain that Plaintiff's stroke was caused by an "injury." However, accidental bodily or physical injury was never a basis of Dr. Ruskin's opinion. The sole basis was stress – caused by the ceiling collapse. Moreover, though Dr. Ruskin described the physiologic mechanisms of a stroke, he discussed how psychological stress, not physical injury, can cause a stroke.

---

[3] The Court does not question the conclusion that a stroke could be induced by psychological stress. Rather, the Court is highlighting that Plaintiff has failed to establish that Dr. Ruskin's conclusion is the product of reliable principles and methods.

Testimony that Plaintiff experienced psychological stress prior to his stroke does not logically advance Plaintiff's theory that his stroke was the result of an injury as opposed to sickness or disease. Simply put, Dr. Ruskin did not testify that Plaintiff suffered an injury when the ceiling collapsed in his office, let alone that any injury "caused" Plaintiff's stroke. Dr. Ruskin's hypothesis about the physiological consequences of "severe stress" on an already compromised and diseased vascular system may have been germane to the negligence claim in Plaintiff's premises liability action against his landlord and contractor, but it has no bearing here.

### IV.   CONCLUSION

As set forth above, Plaintiff has failed to carry his burden in establishing that Dr. Ruskin is using reliable methods in reaching his conclusions or that his opinion will assist the trier of fact. Therefore, the Court will not allow Dr. Ruskin to testify that the roof collapse caused or contributed to Plaintiff's stroke. Accordingly, it is

ORDERED that

(1) Plaintiff's Motion to Strike and Preclude Testimony of Plaintiff's Expert [DE 27] Howard Ruskin, M.D. is GRANTED.

(2) Dr. Ruskin opinion that stress from the roof leak event was a "precipitating factor" in Plaintiff's stroke is stricken. Dr. Ruskin may not testify that stress from the roof leak event was a "precipitating factor" in Plaintiff's stroke at a hearing or at trial in this case.

DONE AND ORDERED in Miami, Florida, this 30 day of September, 2010.

PATRICIA A. SEITZ
UNITED STATES DISTRICT COURT

cc:   Magistrate Judge John J. O'Sullivan
      Counsel of Record